## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Dennis E. Hecker,<br><br>          Plaintiff,<br><br>v.<br><br>Chrysler Financial Services Americas LLC,<br>f/k/a DaimlerChrysler Financial Services<br>Americas LLC,<br><br>          Defendant. | Civil File No. _____<br><br><br><br>**COMPLAINT** |

Plaintiff complains against defendant as follows:

### PARTIES

1.      Dennis E. Hecker is a Minnesota resident.

2.      Chrysler Financial Services Americas LLC is a Michigan business organization that provides financing and insurance services to motor vehicle dealers and their customers.  Chrysler Financial Services Americs LLC was formerly known as DaimlerChrysler Financial Services Americas LLC.  Chrysler Financial Services Americas LLC does business as Chrysler Financial.  Chrysler Financial's principal place of business is Farmington Hills, Michigan.  Chrysler Financial is licensed to do business in Minnesota with its registered office at CT Corporation System, Inc., 100 South Fifth Street, #1075, Minneapolis, MN 55402.  Chrysler Financial is affiliated with Chrysler Motors LLC ("Chrysler Motors" and collectively with Chrysler Financial, "Chrysler"), a Delaware entity.

## JURISDICTION

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332: citizenship is diverse and the amount in controversy exceeds $75,000.

4.     The Court has personal jurisdiction over Chrysler Financial because the claims, contracts, and action at issue implicate contact with and conduct in Minnesota.

5.     Venue is proper pursuant to 28 U.S.C. § 1391:  there is a genuine dispute regarding the parties' actions or omissions that substantially occurred in Minnesota.

## BACKGROUND

6.     Chrysler Financial and its predecessors have provided financing services for Hecker and his many businesses for nearly twenty years.  Despite the parties' long and mutually lucrative relationship and extensive course of dealing, Chrysler Financial over the course of the past eleven months has unilaterally and to the detriment of Hecker and his businesses materially changed the lending relationship.  Most recently, in mid-October, Chrysler Financial suddenly, without notice, arbitrarily, and in bad faith put Hecker's credit lines on hold.  On top of that – and without <u>any</u> notice to Hecker – Chrysler Financial notified the manufacturers of Hecker's automobile dealerships that Chrysler Financial had suspended the floor plan credit lines.  By suspending these credit lines, Hecker and his companies were unable to finance the purchase of new vehicles that were produced by these manufacturers.

7.     Chrysler Financial's undue control and bad faith has resulted in significant damage to Hecker and his businesses.  Without any warning and contrary to the parties' previous agreement and course of dealing, Chrysler Financial unreasonably ratcheted

down the credit line that enabled Hecker to run his car rental business.  This conduct prevented Hecker from operating his car rental business.

8.      At the same time that Chrysler Financial was suspending Hecker's rental car credit line, Hecker was compelled to transition his banking operations from Wells Fargo to U.S. Bank.  In order for Hecker to receive funds from Chrysler Financial and for Hecker to remit payment to Chrysler Financial, Chrysler Financial and U.S. Bank needed to establish a blocked account agreement to permit the flow of funds.  Chrysler Financial knew that Hecker and his dealerships could not make any payments to and receive funds from Chrysler Financial until this blocked account agreement was in place.  Rather than facilitating the blocked account agreement, Chrysler Financial stalled negotiations with U.S. Bank while simultaneously ambushing Hecker and his companies by putting their credit lines on hold, knowing full well that Hecker and his dealerships were not in default.

9.      These unjustified and unreasonable actions and demands have interfered with Hecker's business operations and dealings, causing extensive damage to Hecker and his companies' goodwill and reputation.  Not only has Chrysler Financial's conduct frustrated Hecker's day to day operations, but Chrysler Financial's conduct has seriously jeopardized, if not fatally imperiled, Hecker's attempt – which was initiated at Chrysler Financial's insistence – to sell his car rental business.

**A.      Hecker and Chrysler Financial**

10.     For almost two decades, Chrysler Financial provided fleet financing to Hecker's vehicle leasing businesses, floorplan financing to Hecker's auto dealerships,

and, most recently, fleet financing for Hecker car rental business – Advantage Rent-a-Car.  Until recently Chrysler Financial and Hecker had an amicable business relationship and course of dealings that extended beyond the four corners of their various contracts.

11.     Chrysler Financial floorplan financing has been extended to Hecker and his many dealerships: Autocal, LLC; Forest Lake Imports, LLC; Inver Grove Hyundai LLC; Lake Country Auto Center, Inc.; Monticello Ford-Mercury, Inc.; Monticello Motors, LLC; Rosedale Dodge, Inc.; Rosedale Dodge, LLC; Denny Hecker's Bargain Connection, LLC; Stillwater Ford; Lincoln-Mercury, Inc.; Jacob Motors of Shakopee LLC; Walden Fleet Group, Inc.; and Inver Grove Imports LLC.

12.     A floorplan is a loan for dealership automobile inventory that is secured by the financed vehicles.  Hecker's companies borrow money from Chrysler Financial to buy new cars from the factory, to trade for new cars from other dealers and to purchase certain used vehicles.  Until the vehicle is sold, interest is paid, and upon sale the loan proceeds associated with that automobile are remitted to Chrysler Financial.  Without a floorplan, Hecker and his companies cannot secure new car inventory from the auto-manufacturers, cannot satisfy customer demands and expectations, and in turn, cannot operate the day-to-day business.

13.     Chrysler Financial also provided financing services for Hecker's fleet sales business.  Through Hecker's companies, national fleet customers like Hertz Rent a Car, Avis Rent a Car, Enterprise Rent a Car, the Mormon Church and others purchased new vehicles.  These vehicles were financed by Chrysler Financial on the floorplan of the

selling dealership.  Without this credit line, Hecker cannot secure vehicles to supply the demands of national fleet customers.

14.     This credit line also enabled Hecker to make monthly loan payments to Chrysler Financial.  Specifically, the income from fleet sales transactions financed by this credit line generates the revenue that was needed to service the $500,000 monthly debt payment to Chrysler Financial.

**B.     Advantage and Hecker**

15.     In 1963, Helen and Kenneth Walker started what is now known as Advantage.  A family-owned business, Advantage's main markets were the Southwestern and Western United States.

16.     In the late 1990s, Chrysler Financial began directly financing Advantage's rental fleet.  Chrysler's fleet supply division, Chrysler Motors, became the primary supplier of automobiles.

17.     Over the years, Chrysler Financial gained substantial benefits from the Advantage relationship.  From 2003 to 2005, Advantage paid Chrysler Financial over $45 million in interest.  Similarly, Advantage constituted approximately 5% of Chrysler Motors' total fleet sales, making an almost $100 million contribution to Chrysler Motors' margins for the period 2003-2005.

18.     Despite Chrysler Financial's support, Advantage's financial condition deteriorated in the wake of the September 11 terrorist attacks.  As business turned sharply downward, Advantage was unable to service Chrysler Financial debts and accordingly no longer qualified for additional credit.  This lack of cash prevented Advantage from

enhancing or updating the fleet.   Denied credit and with rising debt and declining revenues, Advantage's losses grew, exposing Chrysler Financial to tens of millions of dollars in what would become uncollectible loans and worthless collateral.

19.     In May of 2005, Chrysler Financial encouraged Advantage to seek out potential investors.   An injection of outside capital would reduce Chrysler Financial's exposure to Advantage's growing indebtedness.   Chrysler Financial estimated that Advantage needed at least $26 million just to cover past due indebtedness.  That amount did not include an additional $40 million that was not yet, but soon would be, in default. The prospect of bankruptcy – which would have significant adverse financial consequences to Chrysler Financial – loomed large.

20.     Relentlessly pressured by Chrysler Financial, Advantage engaged an investment banker.  In June 2005, the Walkers approached Hecker and offered to sell Advantage for $40 million.   Because the majority of the purchase price would be consumed to pay down debt rather than to secure equity, Hecker balked.  Nearly 30 other potential financiers and lenders also passed on the deal.

21.     In August and September of 2005, Chrysler Financial's investment specialists projected that an Advantage bankruptcy would cost Chrysler Financial more than $70 million.  With no prospects for recovery and liabilities growing by the day, Chrysler Financial assessed three options:   an orderly liquidation, bankruptcy, and outside investment.

22.     To assess the costs and efficacy of liquidating Advantage's assets, Chrysler Financial consulted Hecker who had extensive fleet leasing and collateral recovery

experience.   Chrysler Financial asked Hecker to estimate the losses that would be incurred from a planned liquidation.  Hecker projected that, in the best of circumstances, Chrysler Financial would take a $40 million hit.

23.    Chrysler Financial itself forecasted that an Advantage bankruptcy and "non-orderly" liquidation would result in losses of more than $70 million.

24.    The hope for reducing Chrysler Financial's losses would be a third party investment or purchase.  Because Chrysler Financial and Chrysler Motors had become so entwined in Advantage's finances and affairs, Chrysler Financial needed Advantage to stay in business and to avoid bankruptcy.

25.    In October 2005, Chrysler Financial mounted an all out effort to have Advantage acquired by a capable buyer.  Chrysler Financial turned to Hecker.  The month before Chrysler Financial came to Hecker for help, he had sold his fleet leasing business to a major financial player.  Chrysler Financial was the primary lender to that business which had historically sourced and leased new vehicles to daily car rental companies.  The acquirer of Hecker's fleet leasing business did not need the credit facilities that Chrysler Financial had been providing.  The transaction therefore resulted in the loss of a significant credit customer for Chrysler Financial.

26.    Based on the parties' extensive business dealings and on Hecker's experience and success in the fleet business, as well as the cash position he realized from the sale of his fleet leasing business, Chrysler Financial urged Hecker to take over Advantage.

27.     Chrysler Financial knew that Hecker would not be interested in acquiring Advantage if financing for Advantage's daily rental fleet would not be readily available. And importantly, the potential purchase price, coupled with Hecker's capital infusion, and ability to recover vehicles Chrysler Financial financed for Advantage in the ordinary course, would substantially offset Advantage's current debt to Chrysler Financial.

28.     Chrysler Financial also knew that the availability of credit required to secure the vehicles necessary to run the business and a long-term supply arrangement with Chrysler Motors were *sine qua nons* to Hecker's purchase of Advantage.

29.     In November 2005, Hecker met with Chrysler representatives in Las Vegas. As Chrysler Financial expected, Hecker's initial offer contemplated specific and long term commitments from Chrysler Financial for financing and from Chrysler Motors for new vehicle supply.  In response, Chrysler Financial promised to finance the Advantage fleet for five years and Chrysler Motors agreed to supply new automobiles for five years.

30.     Chrysler Financial's own assessment of the potential transaction projected that interest income from Advantage fleet borrowing would more than compensate for any loss incurred from financing the Walkers.

31.     The parties negotiated through December 2005 and January 2006.  Chrysler continued to represent that fleet financing and vehicle supply would not be a problem. Hecker reasonably relied on those representations.

32.     In late February 2006, the parties reached a deal and executed a Memorandum of Understanding documenting the agreement in principle.  Three key parties to the transaction were Hecker, Chrysler Motors, and Chrysler Financial.

33.     Because of the sorry condition of Advantage and the uncertainties associated with the rent-a-car business, Chrysler Financial knew that the transaction was risky and that both parties could suffer significant losses.  Recognizing these challenges and acknowledging that the sale enabled Chrysler Financial to stave off Advantage's failure, Chrysler Financial assured Hecker that Chrysler Financial would stand by Hecker and Advantage.  Such support involved two critical elements:  a supply of automobiles and line of credit.  Chrysler committed to both.

34.     The objective of the transaction was to allow Hecker to right-size the business and ultimately sell Advantage within five years – which would benefit both Hecker and Chrysler.  Neither Hecker nor Chrysler Financial anticipated that Hecker would retain ownership of Advantage for the long term.

35.     Chrysler Motors materially participated in the transaction by offsetting Advantage's outstanding debt to Chrysler Financial.  Chrysler Motors also entered into a five-year fleet supply contract.

36.     The parties initially contemplated that Chrysler Financial would receive a 35% equity interest in Advantage.  But, due to conflicts of interest involving other car rental companies, Chrysler Financial proposed a profit sharing arrangement.  As a result, Chrysler was allocated a 35% share of any profits and participation in any proceeds from the subsequent sale of Advantage.

37.     To induce Hecker to close, Chrysler Financial assured that fleet financing would be available for at least five years.  The fleet financing commitment not only enabled Advantage to continue in business, but Chrysler Financial was provided an

interest income opportunity comparable with the revenues earned from the leasing business that Hecker had recently sold.  But for the fleet financing commitment and Chrysler's repeated assurances of support, Hecker would never have considered acquiring Advantage, much less closed the deal.

38.   In fact, Hecker executed the promissory note and Lease Financing Agreement on February 16, 2006 – nearly two weeks prior to the February 28, 2006 Memorandum of Understanding.  This Lease Financing Agreement extended $600 million of credit and did not prohibit the acquisition of non-Chrysler vehicles for the Advantage fleet.  Tellingly, Chrysler Financial made the $600 million fleet credit line available without requiring any business plan or financial covenants.

39.   Hecker and Chrysler Motors also entered into a vehicle supply agreement that guaranteed that Advantage would receive 86,000 vehicles over the next five years. This agreement was exclusive:  Hecker could only sell, transfer, or lease the supplied vehicles to Advantage.

40.   Chrysler later induced Hecker to sign an all encompassing personal guaranty.  This guaranty was executed after the closing.  Hecker provided this personal guaranty with the understanding – and based on Chrysler's repeated assurances – that Chrysler Financial would provide the necessary financing and other requisite support for the rental car fleet.

## C.   Hecker Strives to Turn Advantage Around

41.   Hecker was the party to both the Lease Financing Agreement and the vehicle supply agreement.  Hecker and his companies used the Chrysler Financial credit

line to purchase automobiles that were leased to Advantage.   The lease payments Advantage tendered to Hecker and his companies were used to satisfy amortization and interest obligations to Chrysler Financial.

42.    Immediately after closing the acquisition, Hecker sought to bring Advantage management, operations, and finances under control.   When Hecker took over, Advantage had over 100 rental locations and was in dire financial straits.   Hecker reduced the number of locations to approximately 50 and concentrated on leisure business at airport locations while increasing the vehicle fleet to 19,000 during peak period.   Current projections for the now streamlined and focused Advantage anticipate operating cash flow of $15 to $25 million depending on industry conditions.   The misunderstanding has been extremely costly and Hecker has expended in excess of $50 million to improve Advantage operations.   Even though the turn around was a struggle, Chrysler Financial continued to extend credit, and Chrysler Motors continued to supply vehicles.   At no time during 2006 or 2007 did Chrysler Financial unreasonably interfere with Hecker or Advantage's operations or credit lines.   Instead, Chrysler steadfastly stood by and supported Hecker.

43.    Chrysler Financial knew about Advantage's marginal financial performance, but nevertheless, as agreed, continued to provide the financing that Hecker needed and had come to expect.   Even though business was frequently shaky, Chrysler Financial encouraged Hecker to become deeper and deeper in debt.

44.    The financial support of Advantage was not just limited to Chrysler Financial.   Since taking over Advantage, Hecker has personally injected nearly $50

million in capital to maintain the business. Without repeated assurances that Chrysler Financial was committed to saving Advantage, Hecker would never have invested these funds.

**D.      Chrysler is acquired by Cerberus**

45.     In the two years following the Advantage transaction, relations between Hecker and Chrysler Financial proceeded as expected and promised. Like during the previous twenty years, the parties' course of dealing rather than a strict application of contractual terms governed the conduct of business. From time to time, Hecker failed to perform as specified in the applicable contracts, and at other times, Chrysler did not live up to the letter of the agreements. Nonetheless, both parties treated the other with flexibility and grace. Most importantly, Chrysler Financial continued to extend credit as Hecker sunk more and more into the Advantage turnaround.

46.     In March 2008, Cerberus Capital Management LP, a private equity firm named after the three-headed dog that guards the gates of Hades, acquired a controlling interest in Chrysler. This ownership and management change by the guardian of hell dramatically altered the relationship between Hecker and Chrysler.

47.     Shortly after the Cerberus takeover, Chrysler Financial advised Hecker that "Other Auto Company" (OAC) fleet purchases needed to cease by the end of 2008. In other words, for the first time in the parties' long standing fleet financing relationship, as of 2009, Chrysler Financial would no longer finance non-Chrysler vehicles. Chrysler Financial thereafter directed Hecker to provide a fleet financing exit plan for 2008. Hecker's 2008 fleet plans that had been provided to and approved by Chrysler Financial

earlier in 2008 included OAC vehicles because supply arrangements with those manufacturers had been made months before this new OAC edict.  Nonetheless, Chrysler Financial never instructed Hecker and his companies to cease securing OAC vehicles for the 2008 model year.  Chrysler Financial's Chairman, Tom Gillman, assured Hecker that Chrysler Financial would be reasonable and supportive throughout the transition.

48.     As required, Hecker submitted fleet plans to Chrysler Financial for approval.  The first Cerberus required plan dated May 20, 2008, was submitted on June 2 and included non-Chrysler vehicles.  Chrysler Financial neither objected to the plan nor indicated that financing would not be available.  This fleet plan was substantially similar to the initial 2008 plan that Hecker submitted to Chrysler Financial prior to the Cerberus acquisition.

49.     On June 20, 2008, at Chrysler Financial's insistence, Hecker submitted an updated fleet plan.  Again, Chrysler Financial never suggested that the OAC vehicles in the plan would not be financed.  Accordingly, Hecker and his companies planned to take delivery of those automobiles.  Pursuant to both the June 2 and June 20 fleet plans, 316 OAC vehicles were to be delivered at the end of June to be in service by July 4, 2008.

50.     When Hecker and his companies submitted funding requests for the previously submitted and approved fleet plan vehicles, Chrysler Financial unilaterally cut off OAC fleet financing.  Those commitments would never have been made if there had been any question about Chrysler Financial's willingness to finance.  Even though Chrysler Financial had discussed getting out of the business of financing OAC vehicles as of the 2009 fleet, credit for 2008 fleet acquisitions had been routinely extended.

Hecker and his companies were not notified that Chrysler Financial had decided to terminate funding of OAC vehicles until Hecker began submitting requests to Chrysler Financial for the vehicles to be funded.

51.     As a result of two severe storms in the spring of 2008, numerous vehicles at two of Hecker's dealerships sustained hail damage.  Because hail-damaged automobiles are difficult to sell, Hecker, with Chrysler Financial's knowledge and acquiescence, decided to move the cars over to Advantage for daily rental.  The titles of the first few groups were transferred from Hecker's dealerships' floorplans to Hecker's Rosedale Leasing's fleet floor plan, and Rosedale Leasing leased the vehicles to Advantage.  But when additional hail damaged cars were sent over to Advantage, Chrysler Financial, without warning and without sufficient explanation, refused to transfer those vehicles to the Rosedale Leasing fleet floor plan even though the vehicles were licensed and titled with Chrysler Financial as the lien holder and leased by Rosedale Leasing to Advantage. Up until this point, in the normal course of Chrysler Financial's floorplan audits, Chrysler Financial had not previously required Hecker's companies to pay-off these vehicles.

52.     In addition to reneging on financing commitments, Chrysler Financial attempted to strong-arm modifications of the financing arrangement with Hecker.  The parties negotiated throughout July and August 2008.  Failing to deal in good faith, Chrysler Financial sought radical departures from the parties' previous course of dealings which contradicted Gillman's previous representations, including imposing significant and unreasonable interest rate increases and requiring a substantial down payment on all vehicle financing.  Hecker refused to yield to Chrysler's onerous demands.

**E.**     **Chrysler Financial pressures Hecker to sell Advantage**

53.     Although Hecker substantially improved Advantage's operations and prospects by streamlining operations and concentrating on airport locations, the recent economic crisis and industry forecasts painted a bleak picture for the future.  Like with the Walkers, Chrysler Financial directed Hecker to put Advantage up for sale.

54.     Abiding by Chrysler's orders, on September 30, 2008, Hecker met with a major car rental company.   The prospect indicated a strong interest in acquiring Advantage.  The only issue seemed to be price.

55.     Chrysler Financial knew that Hecker had opened negotiations and that the prospect had the wherewithal and inclination to make the deal.   In fact, Hecker and Gillman agreed that the potential difficulties that Advantage faced as a stand alone rental car company made the sale of Advantage essential.   Gillman advised Hecker that Chrysler Financial would provide all necessary support and assistance to facilitate the deal.  Chrysler Financial was motivated to support the transaction because the sale would enable Rosedale leasing to pay off, in short order, the financing that had been drawn down to supply the fleet to Advantage.   Hecker's motivation was the recoupment of his investment and the possibility of a profit.  Both Hecker and Chrysler Financial knew that a sale was the ultimate end game for Hecker acquisition of Advantage.

56.     On or around October 9, 2008, Hecker met with Gillman and other Chrysler Financial representatives to report on the September 30, 2008 meeting with the prospective Advantage buyer.  Gillman repeatedly assured Hecker that Chrysler Financial

would support Hecker and provide any assistance necessary to complete the Advantage sale.

**F.      Hecker transitions banking relationships**

57.     In late spring and early summer 2008, Hecker terminated his long time banking relationship with Wells Fargo.  The transition of 230 business operating accounts from Wells Fargo to U.S. Bank took 60 days.  This change-over included moving the operating accounts from which Hecker made amortization and interest payments on the Advantage fleet, as well as the operating accounts from which Hecker's companies made floorplan payments.  The transition was finally completed on October 1, 2008.

58.     Chrysler Financial, however, did not have a blocked account relationship with U.S. Bank for Hecker and his companies' new operating bank accounts.  Until such a relationship could be set up, Hecker and his companies could neither receive funds due from Chrysler Financial nor transmit funds owed to Chrysler Financial.  In order to transact business, Chrysler Financial and U.S. Bank had to negotiate a blocked account agreement.

59.     Chrysler Financial deliberately extended the process with U.S. Bank while simultaneously assuring Hecker and his companies that any delay would not be problematic to Hecker or his business operations.  As a result of Chrysler Financial dilatory tactics, Chrysler Financial and U.S. Bank did not reach an agreement until October 10, 2008.  Because October 13, 2008 was a bank holiday, the first day that Hecker and his companies could resume business as usual with Chrysler Financial was October 14, 2008.  In the interim, some remittances were neither timely received by

Hecker nor by Chrysler Financial.  Based on Chrysler Financial's assurances, Hecker had no reason to believe that these purely administrative lapses would be problematic for his day to day business.

## G.    Chrysler Financial's Ambush and Arbitrary Suspension of Floor Plan Financing

60.    On October 14, 2008, and contrary to repeated assurances and the arrangements that Chrysler Financial and Hecker had agreed to just five days earlier, Chrysler Financial demanded over $20 million in payments from Hecker and his companies.  Chrysler Financial also advised that a "consultative support team" would descend upon Hecker and his companies on October 15, 2008 to develop a cash flow forecast, financial controls, and reporting.

61.    On October 15, 2008, Hecker responded that although certain monies were due, the outstanding amounts were in part the result of Chrysler Financial's failure to honor previous financing commitments.  Reconfirming his compliance with the directive to sell Advantage, Hecker also advised Chrysler Financial about the current status and financial significance of the potential Advantage sale.

62.    Hecker emphasized that financial obligations to Chrysler Financial could only be fulfilled if the credit arrangements were allowed to proceed as usual.  Hecker proposed an "Interim Bridge" that would allow his companies to continue doing business and to facilitate the Advantage sale.

63.    Without warning – and contrary to the parties' well-established business practices – Chrysler Financial suspended floorplan financing for many of Hecker's

dealerships.  In conjunction with this October 15 suspension, Chrysler Financial notified the auto manufacturers that the floorplans for Hecker's dealerships had been put on hold. Chrysler Financial also notified the manufacturers that any amounts owing to Hecker and his dealerships by the manufacturers should be paid to Chrysler Financial.  These amounts included payments due to Hecker for warranty repairs and incentives on new car sales.  Chrysler Financial's actions essentially advised the auto-manufacturers that Hecker's financial condition could not sustain outstanding obligations.

64.     Volkswagen, Ford, and Hyundai responded to the credit suspension by warning that the various dealer agreements would be in breach if floor plan financing was not arranged.  If that were not enough, the floorplan suspensions have prevented Hecker's dealership from ordering new vehicles, meeting customer obligations, and conducting business in the ordinary course.

65.     In addition to suspending dealership floorplans, Chrysler Financial put fleet sales financing for Hecker and his dealerships on hold.  This prevented Hecker from supplying automobiles to Hertz, Avis, Vanguard/Enterprise, the Mormon Church and others.  These entities had ordered new vehicles through Hecker's dealerships for delivery directly to the customers' specified locations.  Importantly, these floor plan lines were paid directly by Hertz, Avis, and Vanguard/Enterprise, resulting in no exposure to Hecker or his companies.

66.     Most troubling, the termination of the Hecker credit lines has jeopardized the potential sale of Advantage.  Chrysler Financial knew that Hecker and his companies regularly conducted business with major car rental companies.  This business relationship

provided the foundation from which Hecker initiated and continues negotiations for the sale of Advantage.  Chrysler Financial's sudden and arbitrary interruption of fleet sales financing interfered with Hecker's relationship with the sales prospect by, at a minimum, fomenting unjustified concerns about Hecker's financial condition and diminishing the value of Advantage by creating the impression that any sale would be distressed.

67.    Chrysler Financial never notified Hecker that all credit lines would be cut off.  The suspension of the financing has caused significant damage to Hecker and his companies and will continue to cause unprecedented and irreparable harm.  Chrysler Financial's conduct directly contravenes the parties' course of dealing and Chrysler Financial's repeated promises to stand by Hecker and his companies.

68.    The day after Hecker's financing was unilaterally axed, Chrysler Financial representatives came to Hecker's companies to conduct an audit.  While at Hecker's dealerships, Chrysler Financial audit representatives attempted to coerce many of the Hecker's controllers to wire money to Chrysler Financial, without providing any opportunity for Hecker to evaluate or dispute amounts supposedly due.

69.    On October 17, 2008, Chrysler Financial demanded payment of over $8 million, including payment for the hail damaged vehicles that Chrysler Financial should have moved to the Rosedale Leasing fleet line as Advantage daily rental cars, and for which Chrysler Financial had not previously required pay-off for.  This claimed receivable was based on Chrysler Financial's unilateral audit – without any input or rebuttal from Hecker.

70.     On October 20, 2008 and October 21, 2008, Chrysler Financial modified the audit deficiency amount and insisted that in excess of $7.8 million was past due.

71.     On October 21, 2008, Hecker challenged Chrysler Financial's audit and itemized the amount that was actually owing.  Hecker set forth a payment schedule identifying when the outstanding balances due would be satisfied.

72.     Hecker explained that the amounts claimed were, in part, attributable to Chrysler Financial's dilatory securement of the blocked account agreement with U.S. Bank, which prevented timely remittances to Chrysler Financial.

73.     Hecker reminded Chrysler Financial that negotiations for the sale of Advantage were ongoing and that continued interference with Hecker business operations would forestall progress and likely diminish the purchase price.

74.     Hecker and Chrysler Financial continued to negotiate over the next several weeks.  Chrysler Financial's actions and the current industry crisis put extreme pressure on Hecker to resolve the cut-off of floor plan financing and to restore the dealerships to normal operations.   Under that pressure, Hecker signed an interim agreement with Chrysler Financial that required substantial payments which Hecker determined could not be satisfied short of an overall resolution of all issues with Chrysler Financial.   On November 7, 2008, Hecker provided alternatives to Chrysler Financial.  Despite Hecker's attempts to reasonably resolve the dispute, on November 7, 2008, Chrysler Financial exercised undue control over Hecker and terminated the entire credit line that had been extended to Hecker and his companies – importantly, the credit line that Chrysler Financial had unreasonably induced Hecker to personally guarantee.  This termination

has wrongfully interfered with Hecker's business operations and caused significant and irreparable harm to Hecker.

### COUNT I:  BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

75.     Chrysler Financial and Hecker are parties to the Lease Financing Agreement.

76.     Chrysler promised that for five years Chrysler Financial would provide Hecker financing for the Advantage rental fleet.  Until recently, Chrysler Financial readily advanced credit, despite marginal Advantage performance, causing Hecker to go deeper and deeper into debt, all the while being assured that Chrysler Financial would stand by the business.

77.     Chrysler Financial had a good faith obligation to perform pursuant to contractual commitments and repeated assurances.  Among other things, Chrysler Financial was required to receive payments in good faith, to release financing in good faith, and to provide financing services in good faith.

78.     Chrysler Financial exercised domination and direction over Hecker and his companies, by, among other things, controlling the release of funds, dictating the vehicles that could be financed, and demanding that Hecker personally guarantee the credit line.

79.     Chrysler Financial refused to extend financing to Hecker and his companies, even though funds that would have allowed Hecker to meet obligations and to conduct business were available.

80.     Chrysler Financial unreasonably and without justification required Hecker to obtain alternative fleet financing for OAC vehicles.

81.     Chrysler Financial in bad faith refused to provide financing to Hecker for OAC vehicles that had been ordered pursuant to fleet plans to which Chrysler Financial had never objected and for hail-damaged cars that were being transferred to the Advantage fleet plan with Chrysler Financial's knowledge and consent.

82.     Chrysler Financial unreasonably and without justification demanded payment from Hecker for amounts not yet due and for amounts that were attributable to Chrysler Financial's failure to deal with Hecker and his companies in good faith.

83.     Chrysler Financial has also failed to comply with its duty of good faith and fair dealing by unreasonably demanding payment from Hecker, by arbitrarily refusing to disburse funds even though such funds were available, and by unjustly refusing to finance OAC and hail damaged vehicles for the Advantage fleet.

84.     Chrysler Financial also controlled whether Hecker and his companies could transmit and receive funds from Chrysler Financial.  Specifically, Chrysler Financial was responsible for a blocked account agreement with U.S. Bank, to which Hecker and his companies' operating accounts had been transferred.

85.     Chrysler Financial failed to establish promptly a blocked account agreement with U.S. Bank.  As a result of that delay, Chrysler Financial could not transmit funds to Hecker and his companies and could not receive remittances from Hecker and his companies.

86.     Because Chrysler Financial lacked a blocked account agreement with U.S. Bank, Hecker and his companies could not make timely payments to and receive funds from Chrysler Financial.   Chrysler Financial nevertheless unreasonably and without justification demanded payment of the amounts that had become past due as a result of Chrysler Financial's own lack of diligence.

87.     As a result of Chrysler Financial's failure to satisfy contractual obligations, Hecker's contractual performance has been frustrated.   Hecker has also been compelled to yield to Chrysler Financial's demands.

88.     Chrysler Financial's bad faith has caused serious damage to Hecker.

89.     As a result of this undue control and interference with Hecker and his companies and Chrysler Financial's ongoing breach of duty to deal in good faith, Hecker has incurred damages many, many times in excess of $75,000.

## COUNT II:  FRAUD IN THE INDUCEMENT

90.     In order to induce Hecker to purchase Advantage, Chrysler Financial represented that fleet lease financing would be available for five years and that Hecker Advantage operations would be assisted and supported by Chrysler.

91.     Hecker relied on Chrysler Financial's false and misleading representations and purchased Advantage and later executed the all encompassing personal guarantee. Hecker continued to rely on these false and misleading representations as more and more money was borrowed from Chrysler Financial and Hecker invested more and more of his own capital in Advantage.

92.     Chrysler Financial representations were false and were made with a then present intent not to perform.

93.     These false representations were material and caused Hecker to acquire Advantage.  These material and false representations also caused Hecker to execute the all encompassing personal guarantee.

94.     Chrysler Financial knew of the falsity, or recklessly disregarded the truth or falsity, of these representations.

95.     Hecker neither knew nor could have known of the falsity of Chrysler Financial's representations.

96.     Hecker reasonably relied on Chrysler Financial's representations.

97.     As a direct and proximate result of relying on Chrysler Financial's fraudulent representation, Hecker has suffered damages well in excess of $75,000.

## COUNT III:  NEGLIGENT MISREPRESENTATION

98.     Chrysler Financial made false representations to Hecker, including but not limited to representations that Chrysler Financial would provide fleet financing services to Advantage and that Chrysler Financial would support Hecker operation of Advantage. Chrysler Financial made these representations with a then present intent not to perform.

99.     Chrysler Financial had a pecuniary interest in making these false representations.   Chrysler Financial received a substantial benefit, including but not limited to being relieved of exposure to an Advantage insolvency and receiving the closing proceeds from Hecker's purchase of Advantage.  Chrysler Financial also received significant interest payments as Hecker's leasing company drew down more and more of

the credit line that Hecker had every reason to believe would remain available for Advantage fleet financing purposes.

100.   Chrysler Financial owed a duty of care to ensure that Hecker and his companies were provided truthful and accurate information.  Chrysler Financial also had a duty of care to ensure that Hecker did not become more and more indebted on a credit line that was about to be jerked.

101.   Chrysler Financial breached this duty by failing to exercise due care.

102.   Hecker justifiably relied on Chrysler Financial's representations.

103.   As a direct and proximate result of this reliance, Hecker has suffered damages well in excess of $75,000.

## COUNT IV:  TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE

104.   Hecker and his companies have contracted and continue to contract with customers for the purchase and sale of automobiles.

105.   Hecker and his companies contracted and continue to contract with auto-manufacturers for the purchase of new vehicles.

106.   Hecker is negotiating with a major car rental company to sell Advantage.

107.   Chrysler Financial knew or should have known about all of these contracts and prospective opportunities.

108.   Chrysler Financial, without justification or privilege, has intentionally and improperly interfered with these agreements and prospective business opportunities by suspending Hecker's financing.

109.    As a result of Chrysler Financial's unjustified conduct, Hecker and his companies have been unable to purchase or sell automobiles.  This conduct disabled prevented Hecker from performing pursuant to the dealer agreements with the auto-manufacturers and pursuant to purchase agreements with retail customers.

110.    As a result of Chrysler Financial's unjustified conduct, Hecker and his companies has been unable to meet supply contract obligations with national fleet customers including Hertz, Avis, Vanguard/Enterprise, the Mormon Church and others.

111.    As a result of Chrysler Financial's unjustified conduct, Hecker's ability to continue negotiating for the sale of Advantage has been materially impaired.  Chrysler Financial's conduct has also diminished the purchase price in any sale of Advantage and the prospects of a sale of Advantage.

112.    Chrysler Financial, without justification or privilege, has intentionally and improperly interfered with Hecker's prospective contractual relations. But for Chrysler Financial's arbitrary suspension of financing, potential retail and fleet customers as well as the auto-manufacturers would have entered into new or continuing contracts with Hecker and his companies.

113.    Chrysler Financial, without justification or privilege, has intentionally and improperly interfered with Hecker's prospective contractual relations with respect to the sale of Advantage to a major car rental company.

114.    As a result of Chrysler Financial's tortious interference with present and prospective contractual relations, Hecker has been damaged significantly well in excess of $75,000.

## COUNT V:  DEFAMATION

115.    The statements made by Chrysler Financial, which were distributed to Hecker's customers, suppliers, manufacturers, lenders and other persons, are false and misrepresent Hecker and his companies' financial condition.

116.    These statements have adversely affected Hecker's credit, property and business, as well as his reputation and good will.

117.    These statements were intended to discourage customers, suppliers, manufacturers, lenders, and other persons from conducting business with Hecker and his companies.

118.    Chrysler Financial made these statements willfully, maliciously, and with reckless disregard of Hecker's rights.

119.    As a direct and proximate result of these false and defamatory statements, Hecker has suffered actual and special damages, in excess of $75,000.

WHEREFORE, Hecker request judgment as follows:

120.   An award of actual and special damages in excess of $75,000; and

121.   An award of reasonable attorneys' fees, costs, and expenses.


Dated:   November 13, 2008          **BRIGGS AND MORGAN, P.A.**


By: s/ Timothy R. Thornton
      Timothy R. Thornton (#109630)
      Molly M. Borg ( #0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFF
DENNIS E. HECKER**